STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1116


MICHAEL BROUSSARD

VERSUS

COUNTRY CLUB AUTO REPAIR


************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DIST. 03
PARISH OF CALCASIEU, NO. 07-08030
HONORABLE SAM L. LOWERY
WORKERS' COMPENSATION JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and James T. Genovese, Judges.


AFFIRMED AND RENDERED.


Mark Zimmerman
4216 Lake Street
Lake Charles, LA 70605
(337) 474-1644
COUNSEL FOR PLAINTIFF/APPELLEE:
      Michael Broussard

Kathleen W. Will
Briney, Foret & Corry, L.L.C.
P. O. Drawer 51367
Lafayette, LA 70505-1367
(337) 237-4070
COUNSEL FOR DEFENDANT/APPELLANT:
      Country Club Auto Repair

PETERS, J.

The defendant in this workers' compensation litigation matter, Country Club Auto Repair, Inc. (Country Club Auto Repair), a Lake Charles, Louisiana automotive body shop, appeals the judgment of the workers' compensation judge (WCJ) which found that the plaintiff, Michael Broussard, suffered a work-related accident and which awarded him weekly indemnity benefits, reasonable medical treatment, and statutory penalties and attorney fees. Mr. Broussard answered the appeal seeking an additional attorney fee award for work performed by his attorney on appeal. For the following reasons, we affirm the WCJ judgment in all respects and render judgment in favor of Mr. Broussard and against Country Club Auto Repair in the amount of $5,000.00 as attorney fees for work performed by Mr. Broussard's counsel on appeal.

## DISCUSSION OF THE RECORD

Mr. Broussard suffered a work-related injury on July 27, 2007, while working as a body technician for Country Club Auto Repair.[1] The accident occurred when a jack collapsed and caused an automobile to fall on Mr. Broussard as he was attempting to push the tires back onto a frame-straightening machine from underneath the fender.

Mr. Broussard reported to Mike Crisp, his immediate supervisor, but Mr. Crisp did not take the report seriously. When Mr. Broussard requested access to medical care the next day, Mr. Crisp rejected his request. Mr. Broussard then approached Wesley Berlin, the company manager, with his claim and was immediately fired.

Two days after the accident, Mr. Broussard presented himself to the LSU - W. O. Moss Regional Emergency Room (Moss Regional) in Lake Charles, complaining of pain in his right shoulder, right scapula, neck, and lower back. The

---

[1]The WCJ rejected the employer's assertion that a compensable accident did not occur and that issue is not before us on appeal.

emergency room personnel examined him, took x-rays of his right shoulder and knee, prescribed pain medication and muscle relaxers, and told him to follow up with an orthopedic surgeon.

Mr. Broussard returned to the Moss Regional emergency room on August 7, 2007, again complaining of pain in his right knee, neck, and back. He was again given pain medication and was told to return if there was no improvement. On that day, he saw Dr. Harpal Benipal, an internist at Moss Regional's outpatient clinic and his primary care physician. X-rays of Mr. Broussard's shoulder and knee were basically negative, but an x-ray of his lumbar spine revealed an old anterior compression fracture at L2. At various times thereafter, Dr. Benipal prescribed Mr. Broussard pain medication for his back and neck pain and placed him on anti-depressants for depression. On May 20, 2008, Dr. Benipal referred Mr. Broussard to LSU for pain management based on his chronic lower back and neck pain. In association with this referral, he issued a no work excuse for a three-month period commencing that day.

Three days after he presented himself to the emergency room on August 7, 2007, Mr. Broussard was involved in a serious automobile accident wherein he received additional injuries. Mr. Broussard was treated at Moss Regional for this incident as well when he presented himself to the emergency room complaining of neck, back, right leg, and left forearm pain. The emergency room physician concluded that Mr. Broussard suffered from an acute lumbar sprain and from a lacerated left elbow. He received stitches in his left forearm, was given pain medication, and released.

The next day, Mr. Broussard sought treatment at the Louisiana State University Health Sciences Center's Emergency Care Center in Shreveport, Louisiana (LSU Shreveport). There, he complained of blood in his urine, pain in his chest, left foot, and right ankle, and an abrasion to his lower right leg. X-rays and CT scans were performed, which revealed a right inguinal hernia, transverse process fractures at T1, L2, and L3 on the left, and two fractured ribs on his left side. After a negative assessment by the Neurosurgery Department, Mr. Broussard was released to return home.

On August 15, 2007, Mr. Broussard returned to LSU Shreveport after his family reported him being disoriented and hallucinating after he abruptly stopped his pain medications. He was hospitalized for five days while undergoing evaluation by the psychiatry department. He was discharged pursuant to three diagnoses on August 21, 2007: delirium secondary to benzodiazepine withdrawal, hypertension, and major depressive disorder.

On October 3, 2007, Mr. Broussard filed a disputed claim for compensation against his employer seeking indemnity benefits and medical treatment as well as penalties and attorney fees for Country Club Auto Repair's failure to provide these benefits. After issue was joined, the WCJ authorized a one-time evaluation by Dr. Dale Bernauer, a Lake Charles orthopedic surgeon.

Trial on the merits initially occurred on April 8, 2009. On July 10, 2009, the WCJ rendered judgment finding that Mr. Broussard had suffered a work-related accident on July 25, 2007, and awarded him weekly temporary total disability benefits (TTD) of $469.52 payable from the date of the accident until modified in the future. The WCJ also awarded Mr. Broussard all reasonable and necessary medical treatment

3

as might be determined by Dr. Bernauer and awarded him penalties of $2,000.00 for his employer's failure to pay indemnity benefits, $2,000.00 for his employer's failure to provide medical benefits, and $11,800.00 in attorney fees.

Thirteen days later, on July 23, 2009, Country Club Auto Repair filed a motion for new trial, asserting that it had acquired evidence of fraudulent statements made by Mr. Broussard during his testimony at trial. Country Club Auto Repair subsequently amended its answer to formally raise allegations of fraud on the part of Mr. Broussard. Over Mr. Broussard's objections and his own reservations, the WCJ granted the employer's motion for new trial and heard the matter a second time on January 27, 2010. The only changes in the judgment resulting from the second trial related to the nature of the weekly benefit and the amount of the attorney fee. Instead of awarding TTD benefits, the WCJ changed the award to supplemental earning benefits (SEBs) with a zero rate earning capacity. Additionally, the WCJ increased the attorney fee award by $5,000.00 to $16,800.00.

Country Club Auto Repair suspensively appealed the WCJ judgment, asserting five assignments of error:

1.    The Trial Court erred in not finding fraud under 23:1208 by finding that plaintiff did not deliberately make false statements under oath about his ability to work, his ability to perform activities, and the child support lien in order to obtain workers' compensation benefits.

2.    The Trial Court erred in finding that the injuries claimed by plaintiff were caused by the alleged work accident of July 25, 2007.

3.    The Trial Court erred in not finding that the subsequent motor vehicle accident of August 10, 2007 was the intervening cause of plaintiff's disability and medical treatment.

4.    The Trial Court erred in finding plaintiff to be entitled to disability benefits from July 25, 2007 to the present since plaintiff failed to prove disability related to the work accident.

4

> 5.     The Trial Court erred in assessing penalties and attorney fees against the employer because the employer had reasonably controverted the claim.

Mr. Broussard answered this appeal, seeking an additional award of attorney fees for the work his counsel has performed on appeal.

**OPINION**

The standard of review applying to factual findings in workers' compensation matters is the manifest error—clearly wrong standard. *Vidrine v. Teche Elect. Supply, L.L.C.*, 08-1287 (La.App. 3 Cir. 4/1/09), 6 So.3d 1012, *writ denied*, 09-964 (La. 6/19/09), 10 So.3d 739.

> Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander [v. Pellerin Marble & Granite*, 93-1698], 630 So.2d [706,] 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Robinson v. North American Salt Co.*, 02-1869 (La.App. 1 Cir. [6/27/03]), 865 So.2d 98, 105. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Robinson*, 865 So.2d at 105.

*Dean v. Southmark Contr.*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117.

### *La.R.S. 23:1208 Fraud Defense*

Country Club Auto Repair's first assignment of error relates to statements made by Mr. Broussard in his testimony at the April 8, 2009 trial. Mr. Broussard testified that he was unable to return to work because he could not bend repetitively, maintain a bent position, or put weight on his knee. Country Club Auto Repair bases its fraud defense on surveillance videos taken by two different investigators over two periods: July 22-24, 2009, and October 20-23, 2009.

The first surveillance video was filmed by Robert Jerry DeFatta, a private

investigator and owner of DeFatta & Associates Investigative Services. According to Mr. DeFatta, he learned that Mr. Broussard might be working at Auto Styling, a Lake Charles automobile customizing, painting, and body shop owned by Mr. Ray Guillory, and on July 21, he went to the establishment and spoke with Mr. Guillory concerning a paint job for his vehicle. In the conversation, he asked Mr. Guillory if Mr. Broussard was there and was informed that Mr. Broussard had left early that day but would be there the next day.

During the three days that followed, Mr. DeFatta obtained approximately thirty minutes of video relating to Mr. Broussard. The video depicts Mr. Broussard emptying a trash can into a dumpster; talking to the employees working on cars; talking to customers and inspecting damaged vehicles; climbing into and out of a semi-truck; helping to unload one tire from the back of a car and rolling it into the shop; walking around vehicles and writing what appears to be estimates; and bending into a vehicle for several minutes while rubbing at a stain on the floor or floor matt.

Based on what Mr. Guillory told him and what he observed during the three days of surveillance, Mr. DeFatta concluded that Mr. Broussard worked for Mr. Guillory at the Auto Styling business. However, he admitted that he never observed what Mr. Broussard may or may not have done inside the shop itself and that he never saw Mr. Broussard perform any heavy-duty body work.

The second surveillance video was filmed by Wallace Dempsey Young, a private investigator with Littleton's Claims Services in Lake Charles, and an associate. Mr. Young testified that they were unable to obtain any video on October 21 because Mr. Broussard remained in the office on that day, and they could not see what he was doing. He testified that on October 22, he observed Mr. Broussard

6

working with another employee on a fender and in the detail area. However, even then, he was only able to see Mr. Broussard walking in and out of the shop area as he could not clearly observe the area from his surveillance position. On October 23, the most he saw was Mr. Broussard working in the detail area and helping sand and change a mirror on a truck.

Mark Perkins, the owner of Master Mechanics, a Lake Charles automobile mechanics shop, testified that he observed Mr. Broussard at the former Auto Styling location leased from him between 2006 and 2008, but admitted that he only saw Mr. Broussard there sporadically and that he never saw him perform any physical labor; rather, he acted more in an advisory role. He further testified that Mr. Broussard wrote approximately five estimates for him at no cost in either 2007 or 2008.

On the other hand, Paul Arceneaux, a friend of both Mr. Broussard and Mr. Guillory and the father of Mr. Broussard's girlfriend, testified that he was present in Mr. Guillory's business establishment several times per week for two to three weeks beginning in July 2009, assisting Mr. Guillory with a frame machine he had sold him. During his visits to the shop, he never saw Mr. Broussard working, although he acknowledged that Mr. Broussard might have dropped by while he was there.

When called to testify, Mr. Guillory acknowledged that he had known Mr. Broussard since childhood and that Mr. Broussard often stopped by the shop when he was unemployed, but he denied ever employing Mr. Broussard. He stated that when Mr. Broussard would drop by, he would perform little odds and ends, run errands, or render him any assistance he could—but as a personal favor and not as an employee. According to Mr. Guillory, the only time he paid Mr. Broussard was sometime before June or July of 2009 when he paid him $300.00 for assistance in

7

writing an estimate for a motor home. Past that payment, the most Mr. Guillory did for Mr. Broussard was to repay his kindness in helping out around the shop by purchasing him lunch from time to time.

Mr. Guillory did acknowledge that Mr. Broussard has a key to the shop, but he denied that he had the responsibility of opening the shop each morning. That job was assigned to an employee of the shop, Carlton Foreman, although he acknowledged that he would not mind if Mr. Broussard were to open the shop from time to time.

With regard to his conversation with Mr. DeFatta, he acknowledged that he recalled being visited by the investigator. He stated that Mr. DeFatta claimed to be hunting someone to perform insurance work for an insurance company he represented. When Mr. DeFatta asked him if he had anyone who could help him if he got behind in his work, he replied that his friend, Mr. Broussard, could assist him in writing estimates. According to Mr. Guillory, he brought up Mr. Broussard's name to the investigator to make him feel comfortable about doing business with Auto Styling. However, he emphatically denied that Mr. Broussard actually wrote estimates for Auto Styling.

Mr. Guillory also acknowledged that he loaned Mr. Broussard a truck owned by him and his brother. However, he testified that the loan had nothing to do with his business and was intended to provide Mr. Broussard with personal transportation for him and his daughter. The vehicle was not being used, according to Mr. Broussard, and it was better to have it driven than to allow it to sit around unused.

Carlton Foreman, the man whom Mr. Guillory testified was assigned the task of opening the business every day, testified that Mr. Broussard was often at the Auto Styling shop. However, he denied that Mr. Broussard worked at the shop. Instead,

8

according to Mr. Foreman, Mr. Broussard would do little more than sit around, drink coffee, and visit with Mr. Guillory and others who might be present. According to Mr. Foreman, body work and detailing were his responsibility, but because he was just beginning his career, he welcomed pointers from the more experienced Mr. Broussard.

At the second trial, Mr. Broussard testified that he has not worked since his July 25, 2007 accident, but acknowledged that he did spend time at the Auto Styling shop. He acknowledged providing Mr. Guillory with advice, handing him tools, picking up lunches, and running errands. However, he denied exercising any supervising authority over Mr. Guillory's employees, although he did acknowledge advising them concerning a particular problem when asked. He also acknowledged that on occasion, he examined vehicles for Mr. Guillory and provided him with information to be used in completing estimates on the cost of repair. Mr. Guillory handled the actual calculations involved in preparing the estimate because although he had previously owned a body shop for eight years, Mr. Broussard could only approximate the cost of repair because he did not have the expertise to enter the data into a computer to properly calculate the repair cost.

Other than the $300.00 testified to by Mr. Guillory, Mr. Broussard denied receiving income from Mr. Guillory. Additionally, he stated that the $300.00 payment occurred after the initial trial, and, therefore, he did not fail to mention it in his testimony because it had yet to happen. He acknowledged having a key to Mr. Guillory's shop as well as possession of Mr. Guillory's truck.

Country Club Auto Repair also asserts that Mr. Broussard made false statements in the first trial concerning a child support lien against him. In his

9

deposition, he had stated that he was subject to a child support lien, but at the first trial, he had testified that he and his former wife had worked out the support issue and that he only owed her a couple of thousand dollars. At the second hearing, Mr. Broussard acknowledged that he still had a child support lien against him, that it was in effect at the time of the first trial, that it amounted to approximately $30,000.00, and that his former wife was aware of his claim against his former employer.

At the end of the second trial, the WCJ denied the employer's fraud claim in its oral reasons for judgment, stating in pertinent part that:

> The heart of the defendant's argument, especially his request for a new trial, is the accusation of fraud.
>
> I listened carefully to the defendant's position on this matter and have concluded that Mr. Broussard was seen standing, walking, and sitting in a body shop during the period he was [unable] to work. Not a single witness that I heard saw him doing any physical labor in what looked like to be rather sporadic visits to his friend's automobile repair shop. No surveillance showed him painting a car. Nothing showed him with a hammer in his hand. He did seem to carry a clipboard on occasion, but nobody submitted any evidence that he was ever paid a salary or a commission or anything resembling that on a regular fashion.

Louisiana Revised Statutes 23:1208(A) provides in, pertinent part, that "[i]t shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation." In order to establish fraud, an employer must prove: (1) a false statement or misrepresentation by the employee, (2) that was willfully made, and (3) made for the purpose of obtaining workers' compensation benefits. *Campbell v. City of Leesville*, 07-1061 (La.App. 3 Cir. 1/30/08), 974 So.2d 908, *writ denied*, 08-491 (La. 4/25/08), 978 So.2d 366. Proof of fraud results in an employee's forfeiture of the right to recover any workers' compensation benefits. La.R.S. 23:1208(E).

10

After reviewing the evidence, including the surveillance video, we find no manifest error in the WCJ's conclusion that Country Club Auto Repair failed to establish fraudulent actions by Mr. Broussard sufficient to trigger the forfeiture provisions of La.R.S. 23:1208(E). In all of the surveillance videos, Mr. Broussard arrived before the shop employees and opened the shop only once. His girlfriend was present with him at the time, and the video does not establish whether she or Mr. Broussard actually opened the door. At all times when he was being videoed at the shop, Mr. Broussard wore shorts and a tee shirt. He generally left at or after closing time; sometimes carried a clip board and appeared to be examining vehicles; was seen talking to other employees and what appeared to be customers; got down on his knees and bent down several times; once emptied an office-sized trash can; moved vehicles, including a semi-truck, around the lot; and he used a palm sander on one occasion to sand the side of a truck. Still, as pointed out by the WCJ, none of the video depicts Mr. Broussard performing actual automotive body work, other than the use of the palm sander on one occasion.

The WCJ obviously found Mr. Broussard to be a credible witness[2] as well as that of the other witnesses testifying on his behalf relative to the fraud issue as the only thing subsequently changed from the previous judgment was the determination that Mr. Broussard was capable of performing some type of work. The WCJ is in the best position to judge the witnesses' credibility, and we find no manifest error in the WCJ's factual findings based on its credibility analysis. We find no merit in this assignment of error.

---

[2]This was so despite the fact that Country Club Auto Repair presented evidence of Mr. Broussard's criminal record in the form of a conviction for carnal knowledge of a juvenile as well as the inconsistencies of his testimony with regard to the child support lien.

11

*Cause of Injury*

In its next two assignments of error, Country Club Auto Repair argues that the WCJ erred in finding that Mr. Broussard's injuries were caused by the July 25, 2007 work accident and in failing to find that the August 10, 2007 car accident intervened as the cause of his disability and medical treatment.

> An employee is entitled to compensation benefits if he or she suffers a personal injury by an accident arising out of and in the course of employment. LSA-R.S. 23:1031. This court has stated that under this statute a successful claimant's proof must show personal injury which is the result of an accident, which accident arises out of and in the course of employment. *Guillory v. United States Fidelity & Guaranty Insurance Company*, 420 So.2d 119, 122 (La.1982). The chain of causation required by the statutory scheme as adopted by the legislature in LSA-R.S. 23:1031 is that the employment causes the accident, the accident causes injury, and the injury causes disability. *Id.* The employee has the burden of proving, by a preponderance of the evidence, that the resulting disability is related to an on-the-job injury. *See Chapman v. Belden Corporation*, 428 So.2d 396, 400 (La.1983). (Medical testimony, along with claimant's testimony, suggested only a possibility of a causal relation between his employment and his disability.); *see also, Anthony v. BE & K Construction*, 32,729 (La.App. 2 Cir. 5/10/00), 760 So.2d 608, *writ denied*, 2000-1673 (La.9/15/00), 768 So.2d 1280.

*Buxton v. Iowa Police Dep't.*, 09-520, pp. 11-12 (La. 10/20/09), 23 So.3d 275, 283.

Additionally,

> Under certain circumstances an aggravation of an injury initially sustained at work is regarded as compensable, obligating the employer to continue paying compensation benefits, even though the aggravation develops away from the premises and when the claimant is no longer employed by the employer. *Stewart v. Hospitals Affiliates International, Inc. of Baton Rouge*, 404 So.2d 944, 945 (La.1981) (A fall at home was causally connected to an at-work injury that weakened claimant's leg.) The aggravation is regarded as a development of the initial accident even though the aggravation develops away from the employer's premises after employment has terminated. *Id.* The Louisiana jurisprudence is consistent with "[m]ost jurisdictions" wherein the general rule is that "natural consequences that flow from the primary injury are compensable absent an independent intervening cause." (Emphasis supplied.) Karenina M. Darmer, *Worker's Compensation for Off-Site Aggravation of Employment-Related Injuries-Blackwell v.*

*Bostitch*, 591 A.2d 384 (R.I.1991), 26 Suffolk U.L.Rev. 529, 532-533 n. 18, citing *Hanover Insurance Company v. Allstate Insurance Company*, 554 So.2d 1261, 1264-1265 (La.App. 1 Cir.1989) (Parties stipulated that the off-the-job automobile accident occurred before claimant had fully recovered from surgery to his knee necessitated by a work injury; the surgeon testified the knee was still highly susceptible to injury.) Commentary has noted that "[i]f, as might be the case with an automobile accident following the work-related accident, there is no causal relationship between the two injuries, any complications [ought] properly to fall outside the employer's responsibilities." 13 H. ALSTON JOHNSON, III, LOUISIANA CIVIL LAW TREATISE: WORKERS' COMPENSATION § 236 at 555 (4th ed.2002).

The key question is the relationship between the second injury and the initial, work-related injury. The courts have held that an accident occurring away from work is compensable, where the work-related injury has not healed at the time of the accident, and as such, rendered the employee susceptible to further aggravating injuries. *See Hughes v. General Motors Guide Lamp Division*, 469 So.2d 369, 376 La.App. 2 1985). (Testimony of two physicians, plus that of lay witnesses, established an "overwhelming preponderance of the evidence" of a causal relationship between the two injuries.)

Another example is *Carter v. Rockwood Insurance Company*, 341 So.2d 595 (La.App. 2 Cir.1977), which arose when an employee's continued weakness in her leg initiated by an on-the-job accident caused a fall in the bath tub. The second accident, which resulted during normal activity, was a natural and anticipatable consequence of the work-related accident. The work-related injury prevented plaintiff from catching herself and thereby was a contributing cause of the fall itself; the work-related injury caused plaintiff to fall with greater force than she otherwise would have, contributing to the severity of the fall; the work-related injury had caused osteoporosis of the leg bone and thereby contributed to the severity of the second injury. The court concluded the nature of the original knee injury was such that the chance of subsequent re-injury was a foreseeable risk and consequence. *Carter*, 341 So.2d at 598-600.

*Id.* at 283-84 (alterations in original).

In the matter before us, the employer has not appealed the WCJ's determination that Mr. Broussard suffered a work-related accident, and, therefore, that issue is not before us. Thus, the only issue before us is whether the August 10, 2007 automobile accident intervened to cause Mr. Broussard's current disability.

13

At the outset, we note that there exists very little medical evidence of Mr. Broussard's physical condition between the day of the work-related accident and the automobile accident of August 10, 2007.[3] This lack of medical evidence is caused partially because Country Club Auto Repair fired Mr. Broussard immediately after he reported his accident and refused, thereafter, to provide him with any medical treatment other than the one court-ordered evaluation by Dr. Bernauer which took place after the automobile accident.

Dr. Bernauer did not see Mr. Broussard until May 28, 2008. Mr. Broussard provided the doctor with a history of the work-related injury as well as the injuries he sustained in the automobile accident. After performing a physical examination, Dr. Bernauer ordered MRIs of Mr. Broussard's lumbar spine, left shoulder, and right knee. He noted also that Mr. Broussard suffered from a preexisting neck and back condition.[4]

Mr. Broussard returned to Dr. Bernauer on June 25, 2008, with continuing complaints of pain in his right knee, lower back, and left shoulder. The MRIs had not yet been performed; Dr. Bernauer instructed Mr. Broussard to return a month later for reevaluation. There is no record that this occurred.

Dr. Gregory Gidman, a Lafayette, Louisiana orthopedic surgeon, examined Mr. Broussard on September 24, 2008, at Country Club Auto Repair's request. At that time, Mr. Broussard complained of a sharp, dull pain in his lower back and right

[3]The entire medical record is contained in the treatment Mr. Broussard received from the Moss Regional emergency room on July 27 and August 7, 2007.

[4]Mr. Broussard had a history of back injuries extending as far back as 1998, when he injured his back after stepping off a pipe rack and falling. This accident prevented him from working for three years. In 2001, he suffered an abrupt onset of parascapular pain after throwing a bundle of newspapers. In 2006, he was involved in an automobile accident wherein his vehicle was rear ended by another. At the time of the work-related accident now before us, he was openly taking pain medication whenever the pain in his back flared up.

lateral thigh down to the lateral three toes of his foot, and left shoulder pain, anteriorly. Mr. Broussard described the back pain to the doctor as varying from moderate to severe; the knee pain to moderate; and the shoulder pain to moderate. He told Dr. Gidman that moving and walking made his pain worse but that the pain was relieved by standing still, stretching, and moving around or lying down.

After conducting an examination and a medical record review, Dr. Gidman opined a diagnosis of chronic lower back pain, left shoulder strain, and right knee strain. He found the clinical examinations of Mr. Broussard's lumbar spine, left shoulder, and right knee to be essentially normal, with no surgical lesions identified. Dr. Gidman recommended that Mr. Broussard undergo a self-directed home therapy program and that he be encouraged to return to work. He said that he would restrict Mr. Broussard to light duty work initially and that he would restrict him from medium to very heavy lifting, repetitive prolonged forward stooping, prolonged and/or repetitive bending, long-lasting unchanged positions, and avoidance of any activities requiring sudden maximum efforts or exposure to continuous vibratory motions.

Dr. Gidman testified that MRIs of Mr. Broussard's lower back, left shoulder, and right knee could be obtained, but he opined that any substantial pathology identified from the MRIs would likely be a result of the August 10 car accident. Dr. Gidman stated that he examined post-accident pictures of Mr. Broussard's car. He described the "entire central third of the windshield was totally destroyed." He further stated that "it would be more probable, due to the significant trauma of his motor vehicle accident, that any pathology in his knee or lumbar spine would be more directly related to his motor vehicle accident than his Workers' Compensation injury."

15

Dr. Benipal testified to Mr. Broussard's long history of back pain prior to his work-related accident. With regard to his current back condition, Dr. Benipal stated that Mr. Broussard's injury is related to both his work accident and the August 10, 2007 car accident. However, he declined to give an opinion as to which accident caused Mr. Broussard's injury based on his opinion that this determination does not relate to his specialty of internal medicine. He did state that because of Mr. Broussard's past accident history, he is prone to back injuries.

Mr. Broussard testified that while he had the car jacked up on July 25, he was up underneath the car's fender well with his shoulder, pushing on the car in order to move it onto the ramp. When the jack slipped off, he stated that the car fell back on top of him. He said that he felt pain in his back as a result of this incident, which he reported to Mr. Crisp. Mr. Broussard testified that when he determined the next day that he was unable to work, he again reported the injury to Mr. Crisp, and then to Mr. Berlin, who fired him.

Mr. Broussard testified that when the vehicle fell on him, he immediately felt pain in his back. He stated that in the August 10, 2007 automobile accident, he hit the corner post of the car's passenger-side front windshield with his head and hit the windshield with his arms. He asserted that, thereafter, his lower back pain became much more severe, but that in time it improved. However, he stated that the lower back pain related to his work-related injury remained the same.

With regard to the effect of his prior injuries, Mr. Broussard testified that he was still taking pain medication as of the time of his work accident. However, prior to the July 25, 2007 work-related accident, his pain was sporadic.

In his oral reasons for judgment, the WCJ found little variance between the

16

evidence presented at the first trial and that introduced at the second trial.  The WCJ

stated in part:

> The fact is Mr. Broussard had a pre-existing back problem and that he regularly and rather openly took pain medication while at work is also information which was readily displayed and previously discussed.
>
> One of the arguments most strenuously urged by the defendants centers around the undisputed fact that on August the 10th of 2007, which was about three weeks or so after the alleged accident at work, Mr. Broussard was involved in an automobile accident.  The employer insists that even if Mr. Broussard is disabled or injured, then the root cause of his problem is probably the traffic accident and not the work-related accident.
>
> Reduced to its barest essentials, the employer's position is that Mr. Broussard is attempting to piggy back his automobile injury onto a workers' compensation claim.  In a word, Mr. Broussard has and is committing out and out fraud, as the employer sees it.
>
> . . . .
>
> The medical records, even those from the employer's physician, paint a picture of a worker with back problems whose situation was aggravated by a work accident.  The motor vehicle accident, according to the medical records, in all likelihood aggravated his back problems even more.  Employee['s] counsel is correct in its assertion that no doctor ever opined that the injury from the work accident had healed, or even improved, by the time of the auto accident.
>
> The clear inference from these reports is that after the Honda work incident, his lower back was very vulnerable to aggravation, which apparently was provided by the auto accident.
>
> There's no substantive evidentiary support, certainly nothing persuasive, for the employer's position that the motor vehicle accident on August the 10th precludes the claimant from pursuing a workers' compensation claim for the July 25th incident at work.

After considering the record before us, we cannot say that the WCJ erred in

finding that Mr. Broussard's injuries were caused by the July 25, 2007 work accident

or that the August 10, 2007 car accident was not an intervening cause of the disability

for which he seeks treatment.  In reaching our conclusion, we note that Country Club

17

Auto Repair's efforts to disprove Mr. Broussard's claim is fatally defective due to the dearth of medical evidence following the work accident. Because Country Club Auto Repair refused to provide any medical treatment to Mr. Broussard until ordered to do so by the WCJ on May 27, 2008, the WCJ was limited to considering Mr. Broussard's testimony and Moss Regional's medical records in determining whether the work accident caused his lower back injury and the further effect that the August 10 accident had on his lower back. As both of these determinations required the WCJ to reach decisions as to Mr. Broussard's credibility (and we have already affirmed that decision), we will not disturb these reasonable evaluations on appeal. Accordingly, we affirm the WCJ's finding that Mr. Broussard's injuries were a result of the July 25, 2007 work-related accident. We further affirm the WCJ's finding that the August 10, 2007 car accident was not an intervening cause of his disability and required medical treatment.

***Disability***

In its next assignment of error, Country Club Auto Repair argues that the WCJ erred in finding that Mr. Broussard is entitled to indemnity benefits from the date of his work accident, as he failed to prove a disability as a result of this accident.

Mr. Broussard testified that he has not worked since his accident, as he still suffers pain in his lower back. He explained that body work includes replacing roofs, quarter panels, bed sides, cradles, and bumpers—and that this involves heavy lifting as some bumpers weigh between 100-120 pounds. He did state, however, that he could perform some light-duty body work such as changing a headlight or using a sander, so long as these duties did not require standing and squatting too long—activities that aggravate his back. Additionally, while he stated that he could

18

do some bending, repetitive bending causes him excruciating pain. On some days, according to Mr. Broussard, the pain is so severe that he is forced to remain in bed. He stated that while he might have three to four decent days, when his back begins to hurt, the pain can persist for as much as a week at a time. His only relief is bed rest and constant hot baths.

Since his accident, Mr. Broussard stated that he has only earned $300.00 from assisting Mr. Guillory with the estimate for a motor home. However, he denied working for Mr. Guillory. He stated that while at Auto Styling, he sits around, drinks coffee, talks, and offers advice to Mr. Guillory. He also admitted running some errands for Mr. Guillory and writing down information for estimates; he denied completing the estimates. He stated that Mr. Guillory takes the information he has gathered and enters it into the computer in order to compile the exact amount.

Mr. Broussard testified that his only income since the accident was the $300.00 paid to him by Mr. Guillory and that Country Club Auto Repair has not offered him vocational rehabilitation assistance or any light duty position.[5] If a light duty position were offered, Mr. Broussard asserted, he would return to work.

With regard to physical restrictions, Dr. Gidman suggested that Mr. Broussard should be restricted to light duty work, and this would preclude medium to heavy lifting, prolonged forward stooping, prolonged and/or repetitive bending, long-lasting unchanged positions, and any activities requiring sudden maximum efforts or exposure to continuous vibratory motions. Dr. Benipal suggested that on May 20, 2008, he found Mr. Broussard incapable of returning to any type of work and suggested that he would recommend that he not return to work for at least three

---

[5]It is undisputed that Country Club Auto Repair has paid no weekly benefits and no medical expenses.

19

months.

The WCJ awarded Mr. Broussard TTD benefits based on the evidence presented at the first hearing. However, after the second hearing, the WCJ changed Mr. Broussard's indemnity benefits from TTD benefits to SEBs and based the SEBs on a zero earning capacity.

Louisiana Revised Statutes 23:1221(3)(a) provides an employee with SEBs if he proves by a preponderance of the evidence his inability to earn ninety percent or more of his pre-accident wages as a result of his work accident, under the facts and circumstances surrounding his claim. *Williams v. Averitt Express, Inc.*, 08-1343 (La.App. 3 Cir. 4/1/09), 7 So.3d 160. Once the employee satisfies his burden, the burden shifts to the employer to prove that the employee is physically capable of performing a certain job, that the job was offered to him, or that it was available to him or within his or the employer's geographic region. *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840 (La. 7/1/97), 696 So.2d 551; La.R.S. 23:1221(3)(c)(i). An award of SEBs is a finding of fact, which will not be reversed on appeal absent a finding of manifest error. *Cooper v. St. Tammany Parish Sch. Bd.*, 02-2433 (La.App. 1 Cir. 11/7/03), 862 So.2d 1001, *writ denied*, 04-434 (La. 4/23/04), 870 So.2d 300.

The WCJ's June 7, 2010 judgment states that Mr. Broussard's average weekly wage is $704.24, and Country Club Auto Repair has not appealed that determination. Based on the light-duty restrictions placed on Mr. Broussard by Dr. Gidman, we find no error in the WCJ finding that Mr. Broussard was unable to perform the heavy work required of a body technician. Moreover, the record is devoid of any efforts made by Country Club Auto Repair to assist Mr. Broussard in returning to gainful

employment. Rather than helping Mr. Broussard, all of Country Club Auto Repair's efforts centered on proving fraud on Mr. Broussard's part in order to evade its workers' compensation obligations. We find no merit in this assignment of error and affirm the WCJ's judgment awarding Mr. Broussard SEBs, based on a zero-rate earning capacity.

***Penalties and Attorney Fees***

In its final assignment of error, Country Club Auto Repair argues that the WCJ erred in assessing it with penalties and attorney fees as it reasonably controverted Mr. Broussard's claim. We find this assertion by Country Club Auto Repair to be without any merit. Country Club Auto Repair did nothing to investigate the claimed accident or to assist Mr. Broussard after he reported his work accident. Instead, it fired him as soon as he reported his injury. Although it gave no reason for Mr. Broussard's termination in the July 26, 2007 statement it presented to him, it later redacted its records on July 27, to state that it terminated Mr. Broussard due to "[u]nacceptable quality of work, leaving work without permission, inferior production time[.]" It further stated that Mr. Broussard "created a scene at the work place after being term[inated] . . . had to eventually call police to have him escorted off the premisis [sic] . . .Now is saying he has a WC injury . . . did not report this until after he was fired[.]"

Louisiana Revised Statutes 23:1201(F) provides for the imposition of penalties when an employer fails to provide indemnity benefits or medical benefits to its injured employee and, in this case, all of Country Club Auto Repair's actions focused on avoiding its obligations at all costs. We find no error in the WCJ's award of $4,000.00 in penalties and $16,800.00 in attorney fees.

***Mr. Broussard's Answer to the Appeal***

We award Mr. Broussard an additional $5,000.00 in attorney fees for the work performed by his counsel in successfully defending this appeal. *Minor v. J. & J. Carpet, Inc.*, 10-45 (La.App. 3 Cir. 6/2/10), 40 So.3d 434.

## DISPOSITION

For the foregoing reasons, we affirm the judgment of the workers' compensation judge in all respects. We render judgment in favor of Michael Broussard and against Country Club Auto Repair, Inc. in the amount of $5,000.00, said judgment representing an award of attorney fees for legal services rendered by Mr. Broussard's counsel on appeal in successfully defending the workers' compensation judge's judgment. Finally, we assess all costs of this appeal to Country Club Auto Repair, Inc.

**AFFIRMED AND RENDERED.**